# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, UNITED STATES OF AMERICA *EX. REL.*, DR. JEFFREY JACOBS<br><br>    Plaintiff,<br><br>    v.<br><br>CDS, P.A. d/b/a POCATELLO WOMEN HEALTH CLINIC; POCATELLO HOSPITAL, LLC d/b/a/ PORTNEUF MEDICAL CENTER, LLC, a Delaware limited liability Company; LHP POCATELLO, LLC, a Delaware limited liability company,<br><br>    Defendants. | Case No. 4:14-cv-00301-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Relator Dr. Jeffrey Jacobs initiated this action on behalf of the United States government pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3724, et seq., against Pocatello Hospital LLC, d/b/a Portneuf Medical Center, LLC, the Medical Center's parent company, LHP Pocatello, LLC's, and CDS, P.A. d/b/a Pocatello

MEMORANDUM DECISION AND ORDER - 1

Women's Health Clinic's. Jacobs' Complaint alleges that Defendants submitted patient claims to the Medicare and Medicaid programs, falsely certifying that such claims were in compliance with the Stark Act, 42 U.S.C. § 1395nn, and the Anti–Kickback Act, 42 U.S.C. § 1320a–7b.

Defendants move to dismiss Jacobs' Complaint. For the reasons set forth below, the Court will grant in part and deny in part the Medical Center's motion to dismiss and deny CDS's motion to dismiss.

## BACKGROUND

Jacobs is a physician specializing in obstetrics and gynecology. He is a former employee of Defendant CDS. CDS specializes in providing women's health care throughout all stages of a woman's life.  Defendant Portneuf Medical Center is an acute care hospital licensed by the state of Idaho. Defendant LHP owns, operates, and manages the Medical Center.

In June 2010, Jacobs executed a Physicians Recruitment Agreement with the Medical Center and CDS, along with a security agreement and promissory note. In addition, Jacobs executed an employment agreement with CDS. Jacobs began seeing and treating patients in August 2010 at CDS and the Medical Center. Jacobs remained employed by CDS and continued seeing patients at CDS and the Medical Center until May 2013, when his employment with CDS ended.

Jacobs alleges that Defendants falsely and fraudulently submitted, or caused the submission of, claims for medical services provided to Medicare and Medicaid patients

MEMORANDUM DECISION AND ORDER - 2

who were referred to the Medical Center by CDS in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), and the Stark Law, 42 U.S.C. § 1395nn. In essence, Jacobs contends that the Medical Center and Health Clinic engaged in a scheme to illegally shift CDS's overhead costs to the Medical Center as a reward or remuneration to CDS for its referrals to the Medical Center. According to Jacobs, CDS shifted its overhead expenses to the Medical Center by recruiting physicians to join CDS's practice and using the hospital-subsidized income guarantee provided by the Medical Center to help pay CDS's overhead expenses unrelated to the additional incremental costs associated with Jacobs and potentially other physicians.

If true, and assuming a Stark Law exception and AKS safe harbor provision do not apply, this alleged arrangement between the Medical Center and CDS could constitute a prohibited financial relationship under both statutes: "If a hospital were to subsidize costs that are not genuinely attributable to the recruited physician, the hospital would confer remuneration on the physician practice for which no exception would apply and which could reflect referrals. This would pose a substantial risk of program abuse under the physician self-referral law, as well as under the anti-kickback statute." Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 72 Fed. Reg. 51,012, p. 51,052-53 (final rule Sept. 5, 2007). This allegedly prohibited financial relationship between the Medical Center and CDS, Jacob claims, made fraudulent every claim for Medicare or Medicaid reimbursement during the period

**MEMORANDUM DECISION AND ORDER - 3**

of Jacob's employment at CDS from August 2010 to May 2013. As a result, Jacobs alleges, Defendants violated the FCA.

Both the Medical Center and CDS move to dismiss Jacob's Complaint without leave to amend on the grounds that Jacobs (1) fails to state a viable claim of relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure and (2) fails to plead fraud under False Claims Act with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

## LEGAL STANDARD

### 1. Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more

than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 557.

The Supreme Court identified two "working principles" that underlie *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the court need not accept as true, legal conclusions that are couched as factual allegations. *Id.* Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. Second, to survive a motion to dismiss, a complaint must state a plausible claim for relief. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n. 1 (9th Cir. 1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts").

### 2. **Rule 9(b)**

FCA cases are subject to additional pleading requirements under Rule 9(b). *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir.2009) (applying Rule 9(b) to the FCA). The rule requires relators to "state with particularity the

circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotation marks omitted). However, an FCA plaintiff "is not required to plead representative examples of false claims submitted to the Government to support every allegation, but he must plead with sufficient particularity to lead to a strong inference that false claims were actually submitted." *Frazier v. Iasis Healthcare Corp.*, 392 Fed.Appx. 535, 537 (9th Cir. 2010) (citing *Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). And Rule 9(b) provides that any state-of-mind requirement for a fraud claim "may be alleged generally." Fed.R.Civ.P. 9(b).

### 3. Leave to Amend

A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (issued 2 months after *Iqbal*). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to

support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007)(citations omitted).

## ANALYSIS

### 1.  Statutory Framework

The False Claims Act imposes liability on persons who knowingly present or cause to be presented to the government a false claim for payment. 31 U.S.C. § 3729(a)(1) (2008), amended by 31 U.S.C. § 3729(a) (2009). First passed at the behest of President Lincoln in 1863 to stem widespread fraud by private Union arms suppliers in Civil War defense contracts, the FCA was and is "intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side." *Grubbs*, 565 F.3d at 184 (quoting S.Rep. No. 99–345, at 11 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5266, 5276). "To aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators, who serve as a 'posse of ad hoc deputies to uncover and prosecute frauds against the government.'" *Id.* (quoting *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir.1992)).

To prove a claim under the FCA, a plaintiff, whether the government or a relator, must show that the defendant "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] conspires to commit a violation of [the FCA]." 31 U.S.C. § 3729(a)(1)(A-C). The key

elements of such a claim are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay our money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

A typical claim actionable under the FCA is one where a claimant did not perform the service for which he seeks compensation or where the claimant did perform the service but overcharged the government. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996). But the FCA's reach is not limited to claims that are false on their face. Under some circumstances, accurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws. *Id.* A legally false claim, which is what is alleged here, occurs when a party represents compliance with a statute or regulation as a condition to payment, without actually complying with such statute or regulation. *Hendow*, 461 F.3d at 1171.

A false certification may be expressly false or impliedly false. *Id.* A claim is legally false under an express certification theory when the party making the claim for payment expressly represents compliance with a statute or regulation. *Id.* A claim is legally false under the implied certification theory when a claimant makes no express statement regarding compliance with a statute or regulation, but by submitting a claim for payment, implies that it has complied with any preconditions of payment expressly contained in the relevant statutes or regulations. *Ebeid*, 616 F.3d at 998. Thus, a

defendant's violation of a law on which the government conditions payment may serve as a "predicate" violation that invokes FCA liability.

In the healthcare context, two laws that often serve as FCA predicates are the Anti-Kickback Statute and the Stark law.  The AKS prohibits payment or receipt of any remuneration to induce referrals. 42 U.S.C. § 1320a–7b(b). Although remuneration is broadly defined, the statute contains specific exceptions, including physician recruitment agreements. The Stark law is designed to prevent abusive self-referrals. The operative provision prohibits doctors from referring patients to a hospital with which they have a financial relationship. 42 U.S.C. § 1395nn(a)(1). Healthcare providers are prohibited from submitting claims to the federal government for services rendered to patients referred in violation of this statute. Among other penalties, Stark specifically prohibits the government from paying on such claims. 42 U.S.C. § 1395(g)(1). Stark, like the AKS, provides for various safe harbor exceptions.

"Falsely certifying compliance with the Stark or Anti–Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA." *U.S. ex rel. Kosenske v. Carlisle HMA, Inc*., 554 F.3d 88, 94 (3d Cir. 2009) (citing *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 235, 243 (3d Cir. 2004); *United States v. Rogan*, 459 F.Supp.2d 692, 717 (N.D.Ill. 2006).

### 2.  Medical Center's Motion to Dismiss

The Medical Center moves to dismiss Jacobs' claims under Rule 12(b)(6), arguing that (1) their compliance certifications were not false claims because the alleged

fraudulent scheme between the Medical Center and CDS did not violate the AKS or Stark; and (2) Jacobs has not alleged facts suggesting that the Medical Center possessed the requisite scienter under the FCA. The Medical Center also argues that Jacobs' Complaint should be dismissed under Rule 9(b) for failing to plead fraud with particularity.

**A. *Failure to Plead Violations of the Anti-Kickback Statute and Stark Law***

(1) AKS

Jacobs, in his Complaint, admittedly mischaracterizes the AKS as a "strict liability statute." The AKS is not a strict liability statute. Rather, to violate the AKS, a hospital or other health care provider must *knowingly* and *willfully* offer any remuneration to induce referrals. 42 U.S.C. § 1320a–7b(b)(1) & (2). The AKS covers arrangements if even one purpose of remuneration was to obtain referrals or induce further referrals of Medicare patients. *United States v. Kats,* 871 F.2d 105, 108 (9th Cir. 1989).

Although he recited the incorrect standard for scienter, Jacobs, as discussed in greater detail below, has pleaded facts plausibly giving rise to the interference that the Medical Center made payments that exceeded the actual additional incremental costs associated with his joining CDS, and that both CDS and the Medical Center were aware of this and refused to address the issue. Accordingly, the Court will not dismiss Jacobs' FCA claim predicated on the AKS, but will allow Jacobs leave to amend to properly plead the scienter requirement under the AKS to make clear his allegation that the Medical Center knowingly and willfully paid remuneration to CDS in the form of excess

"additional incremental costs," and CDS knowingly and willfully accepted remuneration in exchange for CDS providing referrals to the Medical Center.

(2)     Stark Law

The Medical Center argues that Jacobs' FCA claims predicated on alleged violations of the Stark Law must be dismissed because the Physician Recruitment Agreement between CDS and the Medical Center was "a facially valid financial arrangement."

As noted above, Stark prohibits doctors from referring patients to a hospital with which they have a financial relationship, unless an exception applies. 42 U.S.C. § 1395n(a)(1). Under the Act, a physician has a "financial relationship" with an entity if the physician has "an ownership or investment interest in the entity," or "a compensation arrangement" with it. 42 U.S.C. § 1395nn(a)(2). A "compensation arrangement" consists, with certain exceptions not relevant here, of "any arrangement involving any remuneration between a physician ... and an entity...." 42 U.S.C. § 1395nn(h)(1)(A). "The term 'remuneration' includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B). The Stark Act defines "referral" as "the request by a physician for the item or service, including the request by a physician for a consultation with another physician (and any test or procedure ordered by, or to be performed by (or under the supervision of) that other physician)." 42 U.S.C. § 1395nn(h)(5)(A).

**Memorandum decision and Order - 11**

The "oft-stated goal" of the Act is "to curb overutilization of services by physicians who could profit by referring patients to facilities in which they have a financial interest." *See* Jo–Ellyn Sakowitz Klein, *The Stark Laws: Conquering Physician Conflicts of Interest?,* 87 GEO. L.J. 499, 511 (1998). Although the Stark law originally only applied to Medicare claims, it was later expanded to apply to Medicaid claims. See 42 U.S.C. § 1396b(s).

The Act, however, contains exceptions to its broad prohibition in order to exclude from the prohibition financial arrangements that exist for reasons independent of referrals. See 2 Barry R. Furrow et al., Health Law: Practitioner Treatise Series, § 13–9 (2d ed.2000). One such exception applicable here excludes "physician recruitment" arrangements, defined as "remuneration provided by a hospital to a physician either indirectly through payments made to another physician practice, or directly to a physician who joins a physician practice," 42 C.F.R. § 411.357. To qualify for this exception, the following conditions must be met:

> In the case of remuneration provided by a hospital to a physician either indirectly through payments made to another physician practice, or directly to a physician who joins a physician practice, the following additional conditions must be met:
>
> > (i) The written agreement in paragraph (e)(1) is also signed by the physician practice.
> >
> > (ii) Except for actual costs incurred by the physician practice in recruiting the new physician, **the remuneration is passed directly through to or remains with the recruited physician**.
> >
> > (iii) **In the case of an income guarantee of any type made by the hospital to a recruited physician who joins a physician practice, the costs allocated by the physician practice to the recruited**

**physician do not exceed the actual additional incremental costs attributable to the recruited physician**. With respect to a physician recruited to join a physician practice located in a rural area or HPSA, if the physician is recruited to replace a physician who, within the previous 12–month period, retired, relocated outside of the geographic area served by the hospital, or died, the costs allocated by the physician practice to the recruited physician do not exceed either—

> (A) The actual additional incremental costs attributable to the recruited physician; or

> (B) The lower of a per capita allocation or 20 percent of the practice's aggregate costs.

(iv) Records of the actual costs and the passed-through amounts are maintained for a period of at least 5 years and made available to the Secretary upon request.

\*\*\*

(viii) The arrangement does not violate the anti-kickback statute (section 1128B(b) of the Act), or any Federal or State law or regulation governing billing or claims submission.

42 C.F.R. § 411.357 (emphasis added).

On its face, the Physician Recruitment Agreement at issue here complied with the physician recruitment exception. Under the Agreement, the Medical Center would provide a practice guarantee payment to Dr. Jacobs for up to $18,750 each month to be paid to Dr. Jacobs for the first year of his practice, up to a maximum of $225,000 ("Practice Guarantee Payment"). *Compl.* ¶ 63(a). According to the Agreement, the Practice Guarantee Payments were to be used to cover Dr. Jacobs' personal compensation and any additional costs to CDS for Dr. Jacobs' practice at CDS during his first year of practice in Pocatello, Idaho beginning August 23, 2010, and expiring August 22, 2011

("Additional Incremental Costs). *Id.* ¶ 63(b). The Additional Incremental Costs assessed by CDS to the Medical Center *were not to exceed the actual additional costs attributable to bringing Dr. Jacobs into the practice at CDS*. *Id.* ¶ 63(c). And, under the Agreement, CDS could not retain any of Practice Guarantee Payment for its own benefit. *Id.* ¶ 63(e).

Jacobs, however, alleges that the Medical Center and CDS failed to implement the Physician Recruitment Agreement in accordance with the Stark law because the payments made to CDS by the Medical Center pursuant to the agreement exceeded the *actual* additional incremental costs attributable to Dr. Jacobs, the recruited physician. For example, Jacob alleges that CDS claimed office rent in the amount of $26,521 as part of the Additional Incremental Costs attributable to Jacobs for his first year of practice even though CDS did not require any additional space when Jacobs joined the practice. Another example Jacobs offers is CDS's purchase of new equipment, including three new examination tables, which CDS also claimed as Additional Incremental Costs in an amount of $24,036. Jacob says he asked why the purchases were necessary and what they were, particularly because CDS apparently already owned similar equipment that was in good condition, and CDS responded that the Medical Center would pay for new equipment, so CDS wanted to make these purchases. According to Jacobs, "[o]ther employees of CDS took some of the equipment and supplies purchased for Dr. Jacobs for their own use. As a result, Dr. Jacobs was to purchase some of his own equipment and supplies." *Compl.* ¶ 72, Dkt. 20.

Assuming the truth of these allegations, Jacobs has detailed a potentially improper financial relationship between CDS and the Medical Center implicating Stark. The facts Jacobs has alleged make it plausible that the Physician Recruitment Agreement, *as implemented*, violated the Stark law exception for physician recruitment arrangements. Whether the Additional Incremental Costs charged by CDS to the Medical Center under the Physician Recruitment Agreement actually exceeded the actual additional incremental costs attributable to Dr. Jacobs, the recruited physician, is a question left for another day. But Jacobs has alleged facts that suggest they did, and this suffices at this stage in the litigation.

Moreover, it is worth noting that the Medical Center carries the burden of proving that its financial relationship with CDS fell within the Stark's physician recruitment exception, since proof of a Stark exception is an affirmative defense. *See, e.g., United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). "A motion to dismiss under Rule 12(b)(6) cannot be granted based upon an affirmative defense unless that 'defense raises no disputed issues of fact.'" *Tatung Co. v. Shu Tze Hsu*, 43 F. Supp. 3d 1036, 1057 (C.D. Cal. 2014) (quoting *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.1984)). Here, it is not clear from the face of the Complaint or other judicially-noted facts that the physician recruitment exception applies. Thus, it would not be appropriate to grant the Medical Center's motion to dismiss based on the Medical Center's assertion of an affirmative defense. *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("[T]he assertion of an affirmative defense may be considered

**Memorandum decision and Order - 15**

properly on a motion to dismiss where the 'allegations in the complaint suffice to establish' the defense.").

Arguing that Jacobs must indeed plead that the Physician Recruitment Agreement fell outside the Stark Law's recruitment exception and has failed to do so, the Medical Center points to a Ninth Circuit case, *United States v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011). In *Corinthian Colleges*, the relators alleged that Corinthian falsely certified compliance with the Higher Education Act's ("HEA") ban on recruiter incentive compensation. *Id.* at 989. The ban prohibited institutions from providing incentive compensation to recruiters based *solely* on the number of students recruited, admitted, enrolled, or awarded financial aid. *Id.* at 990. According to the relators, the Corinthian's certification was false because Corinthian's recruiter compensation program provided for bonuses ranging from 2.5%–10%, depending on the number of new students enrolled. *Id.*

The Ninth Circuit concluded that the relators had failed to state a claim under the FCA because it appeared from the relators' complaint that the bonus was not *solely* contingent on the number of recruits but was also contingent on performance ratings; in other words, Corinthian's recruiter compensation program appeared to fall within the HEA's safe harbor provision and therefore the Circuit held that the relators failed to state a plausible claim for relief. However, the Ninth Circuit also held that that the inclusion of allegedly non-recruitment performance rating did not allow it "to conclusively determine whether [defendant's] method of awarding salary increases [fell] within the Safe Harbor

Provision." 655 F.3d 984, 993–94 (9th Cir. 2011). The Circuit therefore granted relators leave to amend.

*Corinthian Colleges* is distinguishable in two respects. First, the Ninth Circuit never indicated that proving the applicability of the HEA's safe harbor provision, unlike Stark's safe harbor provisions, was an affirmative defense. But even if proving the applicability of HEA's safe harbor provision were an affirmative defense, it was unclear from the relators' complaint in *Corinthian* whether the recruitment compensation program fell outside the safe harbor provision—*even accepting all of the relators' factual allegations as true.* By contrast, if the Court accepts as true Jacobs' factual allegations in this case – that the Additional Incremental Costs charged under the Physician Agreement, in actuality, exceeded the additional incremental costs attributable to Dr. Jacobs – and draws all inferences in his favor, the Medical Center's financial relationship plausibly falls outside Stark's physician recruitment exception.

But the Medical Center argues, even accepting all of Jacobs' allegations as true, it is equally possible that Defendants engaged in lawful conduct under the Stark Law because the Physician Recruitment Agreement could possibly qualify for the exception for physician recruitment to rural areas. This exception for physician recruitment to rural areas permits costs allocated to a recruited physician to exceed "additional incremental costs" attributable to "a physician recruited to join a physician practice located in a rural area or HPSA, if the physician is recruited to replace a physician who, with the previous 12-month period, retired, relocated outside of the geographic area served by the hospital,

or died," provided the costs are allocated based on "the lower of a per capita allocation or 20 percent of the practice's aggregate costs." 42 CFR 411.357(e)(4)(iii).

But the Physician Recruitment Agreement never indicates that Pocatello qualifies as "a rural area or HPSA," or that Dr. Jacobs was "recruited to replace a physician who, with the previous 12-month period, retired, relocated outside of the geographic area served by the hospital, or died." Likewise, there is no indication in the Agreement that the Medical Center and CDS intended to calculate the costs allocated to Dr. Jacobs based on the "lower of a per capita allocation or 20 percent of the practice's aggregate costs."

The Court will not require Jacobs to plead the non-applicability of a Stark exception that the parties themselves did not appear to contemplate. Indeed, given that nothing in the Physician Recruitment Agreement (in contrast to *Corinthian Colleges*, where the incentive compensation plan on its face appeared to comply with the applicable safe harbor provision) suggests that this exception could apply, it would be improper for the Court to grant the Medical Center's motion to dismiss on this basis. *Tatung*, 43 F. Supp. 3d at 1057.

In sum, the Court concludes that Jacobs has sufficiently pleaded the "falsity" element for a False Claims Act prima facie case.

**B.  *Failure to Adequately Plead Scienter under the FCA***

Next, the Medical Center argues that Jacobs has failed to allege facts suggesting that it had actual knowledge or any reason to believe that the Medicare and Medicaid claims submitted were false under the FCA. Under the second requirement of an FCA claim, Jacobs must plead facts to demonstrate Medical Center's false statements were made

knowingly. Under the FCA, "knowingly" is defined as "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729 (b). Specific intent of a violation of the law is not required under either Stark Law or AKS. *See* 42 U.S.C. § 1320a-7b(n).

Here, Jacobs alleges that he repeatedly asked CDS how it was calculating and identifying the Additional Incremental Costs it attributed to Jacobs, and CDS repeatedly refused to provide Jacobs the records, or otherwise justify the expenses. *Compl.* ¶ 69, Dkt. 1. Because CDS would not provide Jacobs with the information he requested, Jacobs apparently arranged a meeting with the Medical Center's CEO, Norman Stephens, to raise his concerns regarding the Additional Incremental Costs being charged by CDS to the Medical Center under the Physician Recruitment Agreement. *Id.* ¶ 70.  Stephens had signed the Agreement on behalf of the Medical Center, so he presumably knew that the Medical Center was to pay only the actual additional incremental costs. *PRA*, p. 12, Dkt. 1-2. Yet, Stephens allegedly did nothing to address Jacobs' concerns. *Compl.* ¶ 80.

The Medical Center also was obligated under Stark to retain and keep records related to the allowable additional incremental costs. See 42 C.F.R. § 411.357(e)(4)(iv). The commentary to the final rule of the regulations emphasizes the importance of hospital's keeping complete and accurate records of the actual costs it has subsidized to ensure the funds are appropriately handled by the physician practices that receive them; if the hospital fails to keep these records, it may preclude protection under the physician

recruitment exception. Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 72 Fed. Reg. 51,012, p. 51,053 (final rule Sept. 5, 2007). But, according to Jacobs, the Medical Center did not maintain these records as required by the Stark Law.

At the pleading stage, and accepting Jacobs' allegations as true and drawing all inferences in his favor, as the Court must, it is plausible to infer from these allegations that the Medical Center, at the very least, deliberately or recklessly turned a blind eye to the propriety of the Additional Incremental Costs CDS was charging it. The Court will therefore deny the Medical Center's Motion to Dismiss on the grounds that Jacobs has failed to plead the requisite scienter under the FCA.

### C. *Failure to Allege the Who, What, When, Where, or How of the Allegedly Fraudulent Conduct*

The Medical Center next argues that the Complaint should be dismissed under Rule 9(b) for failing to plead allegations of fraud under the False Claims Act with sufficient particularity. "Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).

Where, as here, the FCA theory of fraud is grounded in express or implied certification, a complaint must "plead with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law,

rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule, or regulation." *Ebeid*, 616 F.3d at 998. As stated previously, "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* (quoting *Grubbs v.*, 565 F.3d at 190). *See also United States v. Ctr. for Diagnostic Imaging, Inc.,* 787 F. Supp. 2d 1213, 1220 (W.D. Wash. 2011).

The Medical Center acknowledges that Jacobs is not necessarily required to identify representative false claims to meet Rule 9(b)'s particularity standards. The Medical Center, however, argues that Jacobs' Complaint is deficient because it fails to identify who made the allegedly false certifications to Medicare and Medicaid and when. According to the Medical Center, the "when" in this case "is particularly relevant in light of the FCA's requirement that a statement must be false at the time that it is made in order to give rise to a cognizable claim." *Medical Center/LHP's Opening Br.*, p. 14, Dkt. 21-1. The Medical Center reasons that because the Physician Recruitment Agreement complies with the Stark law exception for physician recruitment on its face, and allegedly only became non-compliant because of problematic execution, "only certifications made with the requisite knowledge after that time and while out of compliance would be considered false." *Id.*

But Jacobs specifically alleged that the Medical Center submitted its cost report certification for each year from 2010 to 2013. *Compl.* ¶ 44, Dkt. 1. Jacobs also alleged

that the Medical Center submitted cost reimbursement claims for Medicaid on Form
UB04s and CMS-1500 from August 2010 to May 2013. *Id.* ¶ 55. Jacobs focused on this
time period from 2010 to 2013 because this was the time period during which the
Physician Recruitment Agreement remained in effect, and during which the Medical
Center made payments to CDS under the Agreement, which allegedly created the
improper financial relationship between the Medical Center and CDS. Jacobs has alleged
that this financial relationship created through the implementation of the Physician
Recruitment Agreement from 2010 to 2013 made any certification to Medicare and
Medicaid "false" during this time period for purposes of the FCA. It can be inferred from
these allegations that CDS and the Medical Center implemented the Physician
Recruitment Agreement in violation of the Stark Law and the AKS from the beginning of
Dr. Jacob's employment with CDS, allegedly making any claim submitted during this
time period "false."

Jacobs apparently had knowledge of this allegedly improper financial relationship,
which has been sufficiently alleged, through his position as the recruited physician
practicing for CDA. This is enough to allege an improper scheme to submit false claims,
as well as reliable indicia that lead to a strong inference that claims were actually
submitted. *Ebeid*, 616 F.3d at 998. Because the Court finds that Jacobs has sufficiently
alleged a fraudulent scheme, Jacobs is not required to plead the details of each
certification. *See, e.g., Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d at 1220-21.

MEMORANDUM DECISION AND ORDER - 22

To the extent the Medical Center's argument essentially restates its previous argument that Jacobs failed to allege scienter under the FCA, the Court has already found that Jacobs has alleged facts giving rise to the plausible inference that the Medical Center knew the "Additional Incremental Costs" CDS attributed to Jacobs and charged to the Medical Center exceeded the actual additional incremental costs; yet, according to Jacobs, the Medical Center took no action to identify the actual additional incremental costs. Thus, Jacobs need not plead with any more particularity "when" the allegedly false certifications were made.

## D. *LHP*

LHP, the Medical Center's parent company, alleges that it should be dismissed from this lawsuit because the Complaint includes no allegations regarding LHP's alleged involvement in the alleged scheme. Jacobs acknowledges that "his Complaint includes limited facts regarding LHP's specific involvement," but argues that Jacobs is aware—through other litigation in which his counsel has been involved—that  LHP has an employee leasing arrangement with the Medical Center, which could make LHP directly liable for the submission of allegedly false claims through its leased employees. *Jacobs' Resp.*, p. 19, Dkt. 22. Jacobs asks for leave to amend to include these facts in an amended complaint.

The dilemma Jacobs' request presents, however, is that this other litigation from which Jacobs' counsel may have acquired the information regarding the leasing arrangement between LHP and the Medical Center is an employment dispute, and the parties entered in Stipulated Protective Order that explicitly prohibited the use of

documents or confidential information obtained through discovery in that matter in another lawsuit. It would be improper for Jacobs' counsel to rely on confidential information acquired in another lawsuit that is protected by a Court-approved protective order.

But, assuming Jacobs is currently able to plead facts that would support a direct claim against LHP without violating the protective order in the other litigation, he should be allowed to do so.  The Court will therefore, grant Jacobs leave to amend his Complaint. Alternatively, the Court will allow Jacobs an additional 45 days to conduct discovery on this issue, and an additional 10 days to file an amended complaint alleging facts that would support a direct claim against LHP.

### 3.  CDS's Motion to Dismiss

CDS also moves to dismiss Jacobs' Complaint against it on the grounds that Jacobs has failed to state a viable claim for relief under Rule 12(b)(6) and to plead fraud under the FCA with the particularity required by Rule 9(b).  Many of CDS's arguments overlap with the Medical Center's arguments but are framed slightly differently. The Court will individually address those arguments not also raised by the Medical Center.

**A.** *Failing to Plead False Certification with Particularity*[1]

CDS claims, based upon *U.S. ex rel. Cook v. Providence Health & Servs.*, 2014 WL 4094116 (W.D. Wash. 2014), that Jacobs has failed to sufficiently plead false certification with regard to Medicaid because the Medicaid provider agreement and Form CMS-1500 do not expressly require compliance with federal statutes as "a condition for payment of a claim."

The Court agrees that nothing in the Medicaid provider agreement or Form CMS-1500 expressly certifies compliance with the federal anti-kickback statutes as precondition to payment under Medicaid. As pled in the Complaint, the Medicaid Provider Agreement states that the signer agrees: "To provide services in accordance with all applicable federal laws, provisions of statutes, state rules and federal regulations governing the reimbursement of services and items under Medicaid in Idaho." *Compl.* ¶¶ 50, Dkt. 1. As pled, Form CMS-1500 states: "Any person who knowingly files a statement of claim containing a misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable by law." This language, as CDS contends, is nothing more than a bare agreement to comply with the applicable laws, rules, and regulations, and "bare agreements to comply" with applicable laws, rules and

---

[1]Like the Medical Center, CDS also argues that Jacobs failed to plead false certification with particularity because Jacobs fails to allege "when" the original Medicare and Medicaid enrollment forms were filed. But, as discussed above in the context of the Medical Center's motion to dismiss, Jacob's allegation regarding the timing of the certifications is sufficiently particular to pass muster under Rule 9(b).

regulations falls far short of certifying actual compliance with those laws, rules and regulations for purposes of the FCA. *Cook*, 2014 WL 4094116, *5.

But *Cook* did not involve allegations that the defendant had violated the AKS or Stark law. The implied false certification theory is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment. This theory is appropriately applied when the underlying statute or regulation upon which the relator relies states the provider must comply in order to be paid. *Ebeid*, 616 F.3d at 998; *Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001). Compliance with Stark and the AKS is a precondition to payment for a Medicaid claim. *See* 42 U.S.C. § 1396b(s) (Stark); 42 U.S.C. § 1320a–7b(g) (AKS).

In fact, in 2010 Congress eliminated any doubt that compliance with the AKS is a precondition to the payment of Medicare *and* Medicaid claims. As part of the Patient Protection and Affordable Care Act, Congress amended the AKS to state: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a–7b(g). The AKS applies to all "Federal health care program[s]," including Medicare and Medicaid. *Id.* § 1320a–7b(f). Thus, the 2010 amendment made clear that compliance with the AKS is a precondition to the payment of claims submitted to both these programs.

Therefore, although the Medicaid forms do not explicitly require compliance with applicable statutes, regulations, and instructions as a *condition of payment of a claim*, both the AKS and the Stark law expressly condition payment of a Medicaid claim on

compliance. Because Jacobs alleges that CDS violated the Stark law and AKS, and the

government has conditioned payment of Medicaid claims on compliance with these

statutes, Jacobs has adequately plead a false certification claim under an implied

certification theory.

### B. *Failure to Allege "Referral" and "Designated Health Service" With Sufficient Particularity.*

Next, CDS argues that Jacobs has failed to allege a referral with sufficient

particularity.  CDS also argues that Jacobs has also failed to allege "designated health

services." However, as already set forth above, the Court finds that Jacobs has adequately

set forth the details of a fraudulent scheme based on factual allegations suggesting that

the Medical Center knowingly made payments to CDS that exceeded the additional

incremental costs associated with Jacobs' joining CDS in exchange for CDS physicians'

referring Medicare and Medicaid patients to the Medical Center for designated health

services. Jacobs further alleges that CDS began assessing costs that were not allowed or

exceeded the additional incremental costs in August 2010 and this continued until 2013,

or the duration of the Physician Recruitment Agreement between CDS and the Medical

Center. This is enough to withstand a motion to dismiss under Rule 9(b).

Jacobs does not need to point to a specific "referral" or claim for "designated

health services" to meet his burden at the pleading stage. *Ebeid,* 616 F.3d at 998-99;

*United States v. Ctr. for Diagnostic Imaging, Inc.*, 787 F. Supp. 2d 1213, 1220 (W.D.

Wash. 2011). As stated by the Ninth Circuit, "it is sufficient to allege 'particular details

of a scheme to submit false claims paired with reliable indicia that lead to a strong

inference that claims were actually submitted.'" *Id.* (quoting *United States ex re. Grubbs v. Ravikumar Kanneganit,* 565 F.3d 180, 190 (5th Cir. 2009)). Jacobs has alleged CDS's plan to refer patients and cause false claims to be submitted based on his knowledge and experience in actually working as a CDS physician. Although it is implicit in the Complaint that these allegedly improper referrals were made for "designated health services," Jacobs may amend his Complaint to make these more explicit.

The remaining arguments that CDS makes largely echo the arguments the Court rejected in the context of the Medical Center's motion to dismiss. For instance, CDS argues that Jacobs fails to provide detailed allegations suggesting that (1) the payments CDS received actually exceeded the additional incremental costs, (2) CDS had knowledge that the payments from the hospital exceeded the additional incremental costs; and (3) CDS had an improper financial relationship with the Medical Center giving rise to Stark liability. The Court addressed all of these arguments in the context of the Medical Center's motion to dismiss, finding that Jacobs had plead sufficient facts to suggest an improper financial relationship between the Medical Center and CDS and to draw the inference that Defendants had the requisite scienter. Likewise, the Court has found that adequately alleged a fraudulent scheme, and therefore The Court will therefore not rehash those arguments in the context of CDS's motion to dismiss. Instead, the Court merely notes that its analysis applies equally to CDS's arguments and will deny CDS's motion to dismiss.

**MEMORANDUM DECISION AND ORDER - 28**

## ORDER

**IT IS ORDERED that:**

1. Defendant CDS, P.A. d/b/a Pocatello Women's Health Clinic's Motion to Dismiss (Dkt. 20) is DENIED.

2. Defendants Pocatello Hospital LLC, d/b/a Portneuf Medical Center, LLC, a Delaware limited liability company and LHP Pocatello, LLC, a Delaware limited liability company's Motion to Dismiss (Dkt. 21) is GRANTED in part and DENIED in part. As discussed in the decision, Jacobs is granted leave to amend its Complaint against LHP *within 10 days of entry of this decision* if Jacobs can plead facts that would support a direct claim against LHP without violating the protective order in the other litigation. Alternatively, the Court will allow Jacobs an additional 45 days to conduct discovery on this issue, and an additional 10 days to file an amended complaint alleging facts that would support a direct claim against LHP.

DATED: September 28, 2015

B. Lynn Winmill
Chief Judge
United States District Court